Good morning, Your Honors. Patrice Bishop from Skelosville and Brody on behalf of plaintiffs. Your Honors, this is a case by a class action. The class period is from October 11, 1999 through December 26, 21, 2001, by shareholders of a publicly traded company. And I apologize for not doing it before. I would like to reserve a rebuttal of five minutes. Okay. You keep track of your time and we'll try to help, but it's your job. Yes, Your Honor. This is a case with regards to violations of 10b and 20a during the class period by computerized thermal imaging. And pretty much their name says it all. They deal in thermal imaging products. And this is the rare case where the perpetrators of the fraud have actually confessed to that fraud. Now, we are appealing the lower court. We're not going to go that far, counsel. We know what's in that counterclaim. And it's a general statement of misleading or false facts about the FDA's procedure and so forth. Well, let's come to grips with this very demanding new act, 1995 Act. Where is the specificity to show scienter of Mr. Packer and the others that they knew what they were saying were false? Cut to the chase. Under Silicon Graphics, which is obviously our big deal in the Ninth Circuit, basically they require for us to show scienter the correct state of mind under the Public Private Securities Litigation Reform Act of 1995, which Your Honor refers to, we must prove a strong inference of deliberate recklessness or conscious misconduct. In this case, we're not alleging a strong inference because they have admitted to conscious misconduct. So we're not inferring that they've done something wrong because they've said CTI, when they filed that complaint, that counterclaim on August 6, 2001, said we did these wrong things. We did them through Mr. Packer, our president. Without its people, a corporation cannot talk. A corporation is sort of an amorphous body made up of business products and people who talk on behalf of them. So shareholders who invest in those corporations are dependent on who talks. When they issue that counterclaim, which is never contrary to defendant's misleading statements in their briefs. They've withdrawn that and there's been no adjudication. You have to depend on this being a binding judicial admission by the corporation itself aside from what these officers themselves knew or did know. And you don't make a case against them. You've only got a judicial admission if it is against the corporation. That's the best you can do with that counterclaim. Well, I believe at this point, Judge Rievele, the counterclaim is actually speaking for Mr. Packer also. Because in any 10B action, if we have reliable sources of information such as, you know, the chief operating officer said that during this time frame this happened. In this case, CTI said in 1998 through 2001, Mr. Packer routinely issued false and misleading statements as to when items would be submitted to the FDA. And your position is that that is an admission of Mr. Packer when it's made in a counterclaim against him? Well. Is that what I heard you say? That's what I heard you say. Is that what you meant? Judge Tomlin, it's an admission of CTI, and CTI is therefore providing witness to what Judge Packer had done. Just as in any other case. You said it was an admission of Packer. That's what I heard you say. Did you misspeak? Well, we have no evidence other than a generalized opposition that, yes, we have alleged in the complaint that Mr. Packer has not denied those facts in any way, shape, manner, or form. And we do not have, as Judge Reveley pointed out, a trial verdict. I mean, the other issue here certainly is. Well, the case has been settled. Is that right? That case has been settled? Yes, but there is no information with regards to that settlement. And there is a major problem here with defendants asserting in their appellee's brief that the assertions made in the counterclaim were withdrawn. They tried to withdraw them, but as noted, but this isn't actually binding on our complaint because we need to take the complaint as a whole. But, you know, extrinsic evidence shows us that it was never withdrawn. What am I missing here? Why are we talking about evidence? Isn't this a motion on the pleadings? Yes, and that's actually a very important case. And the question really is pleading with particularity under the statute. All you've got to do is say something's true, and we'll test later whether it is. But you've got to say it with some particularity. And whether they've admitted it or not at this point doesn't matter, does it? And that is exactly true, and I believe that's part of the place where the lower court missed the point. I mean, reality is this is a case where we haven't, the trier of fact hasn't got to see any of the evidence, but despite this, we've had rulings on materiality. I mean, that is really an issue for the trier of fact. But despite that. Well, I'm not sure that's true. That is to say, taking what you allege in your complaint as true, if the judge says that's not material and therefore is not enough to make out a cause of action for fraud, I mean, the judge is perfectly within his rights to dismiss. So I think judgment of materiality is a question that can be decided on 12B6. The only thing the judge is required to do is accept what you said is true. Your Honor, even if that is true, under the facts presented, a reasonable shareholder, which is the law in this circuit, looking at the information provided of him, would certainly not find these items. Could you address materiality specifically with respect to claims 6 and 7? It was those two claims, I believe, that the district court said whatever misstatements might have taken place were immaterial. One of those was the sale to Latin American folks, and the other one is the request by the head coach, who turned out not to be the head coach, but rather a volunteer chiropractor. Could you discuss materiality with respect to those two? Yes, Your Honor. It was Statement No. 5, which was issued on June 15, 2001, by Mr. Brennan and Mr. Secord, and Statement No. 7, which was issued on June 21, 2000, which is issued by CTI. Let's take these in chronological order. The June 21, 2000 basically said that the head coaches of the United States track and field coaches ordered two thermal imaging systems from CTI. And, in fact, you're saying what was true instead? What was true instead was this was actually denied by the general counsel, and this was alleged in our complaint, and it was ordered by a volunteer chiropractor. Was it ordered or requested? It was requested by a volunteer chiropractor. So instead of being ordered, it was requested? Instead of being ordered by the head coach or coaches, it was requested by a volunteer chiropractor? Which I believe a reasonable investor would find material, especially during this time frame. I mean, June 2000, with all due respect to Mr. Gore and now President Bush, they were not the headliners of information of June 10, 2000. It was Marion Jones and her brethren running for the Olympics. This was big news, and CTI wanted to get in on that big news. And so they said the United States track and field coaches ordered these machines to look at these very impressive athletes who are showing up on the cover of Time and are constantly being talked about. And this isn't reality. And the person telling us that this isn't reality is the general counsel of the United States Track and Field Association. This is a fairly important person who's saying, you know what, this was only ordered by a volunteer chiropractor. And are you telling us that it's material to an investor who might have ordered or requested those things? Yes, because an investor would believe that if... At some point, something is so immaterial, I think a judge can say, listen, this is immaterial as a matter of law. Are you saying whether this is material, how important this is to an investor, is a jury question? Yes, I believe this is a question for the trier of fact. This is not a question of law. Okay. How about the other one? The other one is the fact that Mr. Brenna and Mr. Secord issued statements that they were pleased with their submission package to the FDA. And this had to do specifically with Module 5 and the clinical information. Now, the problem with this... Actually, I was asking about a different one, and that is a statement, I think it's number 6, where CTRI announces that it sold 10 of these machines to a Latin American consortium for about $5 million. Okay. I apologize, Your Honor. This was actually, I did not think was one of the issues where he said it wasn't necessary. I will address that. I apologize. The materiality issue. Am I mistaken? I thought that the district judge had said that that was immaterial. Okay. Yes. He did actually under Brody, evaluating Brody. So essentially what that was, was the sale of 10 million BCDS for 5 million. And this would be material to a shareholder, because the shareholders were only told partial information as to what the Latin consortium was getting. In essence, they weren't really paying $5 million, and the company was giving them extra items in direct response to obtaining these BCDS items. Do we know from your pleading whether these options were given only to this purchaser, or whether it was a policy that they would give for any order of that size? Well, there were no other orders of this size. It was only given to... So we just don't know about the policy for the option? It was a policy given to these people, but these were the only ones who purchased, because certainly no one within this country could purchase a BCDS system, because it had not yet been approved by the FDA. So the only announcement... They hadn't presented it as a part of the deal if they did get a purchase. And this was a Latin consortium based in Mexico City, so they could purchase these items. And essentially with the options on the day of closure to the shareholders, which would be the day that it was important to shareholders... These were the breast imaging devices? Yes, and it was worth... When you calculated the options, it was only worth between $550,000 and $560,000. So, yes, I believe that would be found material by a reasonable investor, and would also be a question left for the trier of fact. And I think that's a large issue here, is the lower court took it upon itself to be the trier of fact. In addition to the materiality, he declared that the admissions themselves were not enough to find CTA could be held liable at the motion to dismiss stage for 10B liability. Now, the problem with that, and all the case law relied on by defendants in the court, is any time when an allegation was not taken as a judicial admission was a case in where the lower court was at the motion for summary judgment stage. So at that point, at least the plaintiffs have had the opportunity to conduct discovery. As we are all aware, the PSLRA does not allow us any time to conduct discovery until after we have gotten through this motion to dismiss period and have an operative complaint on file. So certainly, in this case, I don't believe the trier of fact should have been evaluating the admissions and whether they were enough. These were judicial admissions and should have been accepted as CTI saying, you know what, in 1999, at the start of the class period, when Mr. Packer said, the modules are coming out, and the counterclaim says he knew they weren't coming out. We have to accept that as truth, and it is pled in the complaint, and we should not be going outside of that complaint. When Mr. Packer said, we are pleased to have finished this part of the clinical trial, we need to accept that. And the counterclaim at CTI says they didn't finish this part of the clinical trial. We need to accept that. Counsel, let me ask you a practical question. If we were to reverse and remand with regard specifically to Statements 6 and 7 for further proceedings, what would your position be vis-à-vis the other statements if, as part of that remand, we affirmed the district court's determination that the other statements did not meet the pleading requirements of the PLSRA? Well, certainly we would accept leave to amend on those issues, but I also believe... Well, I'm telling you that, in my hypothetical, you wouldn't be allowed to amend because we would affirm the district court's dismissal, which included, as I understand it, his determination. I guess he offered you the opportunity to replead, but you chose not to do so. You say in your brief, though, that you sought to amend. I don't understand the conflict in the briefs on that, if you'll let me know. Oh, yeah, absolutely, sure. Well, certainly we believe that leave to amend should have been granted. The judge considered it. Granted. Did you seek it? Did you seek a leave to amend? We did not expressly request it, but under Rule 15, I believe it should have been granted. And once the judge took it upon himself to consider that, it should have been granted on all... Didn't he, on his own, offer you the opportunity to amend? But not entirely all issues which, under Rule 15, should be granted. I mean, basically, the judge said there were particularly problems. Excerpt of the Record 120. Plaintiffs allege many statements that do not clearly specify which are misleading. That is certainly something that we could have addressed if he thought there was more need to leave to amend. While I believe there is enough there with the admissions, there are other issues. With regards to specifically Judge Tallman's questions, for example, quickly, 1 and 2, say instance 1 and 2, 1 consisting of 2, 1 on October 19, 1999, and the second one on December 10, 1999. The judge in Excerpt of Record 122 said, The problem is the counterclaim alleges no facts supporting its conclusory allegation that Packer knew certain representations were false when he made them. Those are another issue that we have investigators. We can pull all our information together and put forth more. Ms. Fisher, let me ask the question in a more direct, leading fashion. Wouldn't your position be if we affirmed in part and reversed in part that all of those statements would still be admissible under 404B in order to establish the material falsity of your securities fraud theory? Yes, and I believe also that would be supported by BRODO. Okay. And I'd like to reserve the remaining time. Thank you, Your Honor. Thank you. Please, the Court. I'm Tim Volpert. I represent all of the defendants except for Brenna. Mr. Markley with me represents defendant Brenna. Are you going to split argument? We're going to split argument. Half and half?  You can keep your voice up. Pardon me? Yes, I will, Your Honor. At the Court's suggestion, I will try to cut to the chase here. I think I have a picture of what you're looking at. But there's a couple things that I do want to make clear as kind of preliminary matters. One of them is that there's a statement in the briefs, I think twice in the briefs, saying that Packer did not deny the allegations. And I just want to make it very clear that Packer did in the Utah complaint, did deny the allegations both in his answer. Do we care? Pardon me? At this stage, do we care? I don't think you do, but just in case. So, yeah, I will cut to the chase beyond that. I also want to point out one more thing about the possible effect of admissions. There's no case cited, there's no case I know of, that says that an allegation made in a prior case is an admission in this particular case. So I think that issue is just a non-issue. The question then becomes, as the Court realizes, are the allegations in this complaint sufficient to satisfy the extreme pleading burden created by the Reform Act? And I think the trial court very carefully went through those allegations, every single one of them. And I think it is fair to say, and we try to go through every single one of them in our brief, except I think the plaintiffs basically have abandoned most of them from what I can tell. But as to every single one of those, they don't even come close. Well, then turn to the hardest one for me, which is number six, the sale to South America. The South American sale? Okay. All right. Now, what we have here is an allegation. Now, they claim in their reply brief, the plaintiffs claim in their reply brief, that they're claiming that this is a false allegation. But what they've alleged is that there's a failure to disclose, that facts were omitted. We're under the Brody type of situation. Well, your client issues a press release that says we sold 10 units and it's worth $5 million. But the plaintiffs allege that not so fast, if you figure in the value of these options at $1.67 and the offering price on the day of the announcement is $10.75, that it's really only worth about $550,000. That's a pretty significant difference. The problem is that in terms of the plaintiffs pleading and the pleading burden under the Reform Act, they don't come close here. What they've alleged is that there was a sale for $5 million. Now, there's no allegation. No, they're alleging a sale for $550,000, which you publicly proclaim to be worth $5 million. I'm sorry. What the press release says is that there is a sale for $5 million. Now, there's no allegation that that is false in the plaintiff's complaint. Whoa, wait a second. Aren't you in paragraph 46? Yeah. Well, it can't be both. It's either one or the other, and that means that either the $5 million number is false or it's not. Wait a minute. I think what they've alleged is that we have omitted to state the fact. I don't think that they have omitted the fact. Yeah, the fact of what the actual price was. That's the allegation. That there is a false statement. So I guess your question then is. I mean, it sounds material to me. I guess that's what I'm having the hardest time with on number six. Well, number six. I mean, to say that it was really only 10% of what the publicly announced price was is a pretty significant omission. Well, first of all, as to materiality, I think, Your Honor, the question to a reasonable investor is likely to be whether or not there's somebody out there using these breast cancer detection systems. But let me go one step further. Counsel, wouldn't the real inquiry by the investor be, is this company selling any of its products at all? Are they ever going to be profitable? It might be, but let me go one step further. I want you to understand here that materiality was an alternative ground that the district court used in this case. The district court did not simply decide that this was an immaterial allegation, period, end of story. That's what the appellant's brief says. But what the district court actually did was said that he had his doubts about whether it was material. But then he went into the issue of whether or not it is an untrue statement or is a misleading statement. If it is a misleading statement, let's say if there's an allegation that this is a misleading statement, then we're under the Brody decision. And in Brody, this court made it pretty clear. As I read paragraph 46, I have to say that there is a clear allegation that it is untrue. And somebody may characterize it as misleading. But as I read paragraph 46, it says that statement is untrue. It's not very hard for me to read paragraph 46 to say that. What I read in paragraph 46, Your Honor, is that the press release did not disclose. As I see it, it is a nondisclosure allegation. But let me assume. That's right. The press release says we sold them for $5 million. The press release did not disclose that we sold them for a half a million dollars. Okay. Let me assume. Let me assume that it is false. Let's assume we can call it how you want to call it. We still, in that case, fit under Brody. We still, in that case, fit under Brody where we did not make any affirmative allegation to suggest that there were no additional terms in this deal. We didn't make any affirmative allegation. It's not as though we said this was a flat-out one-term cash deal for $5 million, no strings attached. Well, here's what you said. I'm just reading from paragraph 45. Now, maybe you didn't say this, but this is what paragraph 45 says you said. Announced today the sale of 10 CTI breast cancer imaging systems to a Latin American consortium based in Mexico City for $5 million. Sounds as though you announced you sold these 10 machines for $5 million. Okay. Let's assume we did that. But there's no allegation that we didn't sell them for $5 million. Look at what they say. I guess you don't really want to read paragraph 46, do you? I'm glad to refer to paragraph 46, Your Honor. I still don't think there's a – well, let me look at it. It said the press release did not disclose that the Latin American consortium would receive $50,000 shares of stock options. For each $500,000 system sold, the buyer gets two-year options to buy 50,000 shares at $1.67 a share. Now, the point is, Your Honor, that given the very specific pleading requirements of the Reform Act, there's no allegation here that the sale was not completed. There's no allegation that the $5 million was not paid. There's no allegation that anyone ever exercised – that they ever exercised this two-year option. There's not even any allegation here, Your Honor, as to what the option would actually be worth. Because the allegation they make here is as to the value of the option on the date the sale was announced, not on the date the sale was consummated. So what we have here is we have a claim, an assertion by the company, that they sold for $5 million and they got a $1.75 million down payment. Okay? Now, there's no allegation – and I know you don't like me to say this – but there's no allegation that's false that that sale was not completed. There is simply an allegation that there was an additional term whereby this purchaser had the right over some period of two years to obtain some stock from the company. Now, you could say that that is material. We don't think it is. We think the trial court's right that it's not material. But even if it's material, you still have the issue of the pleading requirements. You still have to get around Brody. You still have some – you have to make some affirmative misstatement. Something to suggest that there's something in that press release that said, as I said before, that this is a no-terms deal. This is just a one-term deal. $5 million, no other terms. So it's not – your view is that it's not misleading under Brody's definition of what constitutes a misleading statement. Right. It's also my position – and I hate to say this again – it's also my position that I don't think it's on its face that there's a sufficient allegation that it's false. But let me go back to misleading under Brody. I'm looking at Brody's definition at 280F3006. To be misleading, to be actionable under the securities laws, an omission must be misleading. In other words, it must affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists. And I'm wondering why, if the option was as generous as it was, it's not misleading for the company to claim that it's a $5 million sale. Because, first of all, we don't – remember, with the pleading requirements, first of all, we don't know how generous the option was. There's no pleading as to – proper pleading as to how generous the option was. But second of all, I think that – and this is a short press release. And if Brody means anything, it means that we're not going to stick – Did you have a page limit on your press release? I'm sorry? Did you have a page limit? No, we did not have a page limit that I listed on our press release. In other words, you could have written a long press release. But frequently – but frequently companies will issue short, you know, brief press releases announcing a sale of a product. Yeah, I know. And the point here is that I think the answer to the question is that if the representation made in here, again, suggested that we are now going to outline for you all of the terms of this sale to the consortium, and then went down and said $5 million – $1.75 million down payment, period. Then I think under Brody you have a material – you arguably have a misrepresentation. This doesn't go that far. This just says a sale was made. And you see, it seems to me that under the pleading requirements, the strong pleading requirements of the Reform Act, they were required to say there in fact was no sale made or they're required to say that there was in fact $5 million was not paid. They're required to say that – they're required to plead specifically what the auction was worth. Okay. Can I ask about another one? And that's about the chiropractor. Yes. In paragraph 47 of 48, 47 says that there's been an announcement that the head coaches, naming them, David Chaplin and Davis, have specifically asked CTI to provide thermal imaging for the field trials in Sacramento. Paragraph 48 says that's false and misleading because that's simply not true. Instead, a volunteer chiropractor named Dean Clark requested the equipment, and further, Clark is the owner of a chiropractic clinic located in Oregon and shares an office with one of the defendants. Can you tell me why that difference between what was stated, specifically ordered by the two head coaches, and what is alleged to be true, a request by someone who's a volunteer chiropractor who knows one of the defendants, why that's not material? Yeah. Well, yeah, I'll answer that question, certainly. It's not material because this is not – there's no allegation made that this is the breast cancer detection system. There's an issue here. It's unlikely – it almost certainly is not. They are using this for track and field athletes. There's nothing that says that it was our equipment – I mean, excuse me, that it was the breast cancer detection system that they're even talking about here. That's why I think the court found that it was likely immaterial because you're not talking about the same product. But, again, the court did not simply say – Is the fraud limited to material misstatements only about one product of the company? No, the question, though, as to materiality is whether or not – Could you answer that question? I'm sorry, question? You're telling me, well, it's a different product, and I'm asking you is the allegation of fraud limited to false statements about one product of the company? Are there allegations of fraud limited to that? Correct. Yes, I believe they are. Well, you just told me they're not. That is to say, you just told me they're talking about a different product. Well, I think the focus of their complaint is – Well, I don't know about the focus. I'm reading the complaint, and if it's in the complaint, it's in the complaint. Okay. Well, all I can tell you, Your Honor, is that I think the materiality aspect of this thing is simply because a reasonable investor who is choosing to invest in the breast cancer detection system, it should not matter to them whether or not a sale was or was not made to the chiropractor. Are they investing in a breast cancer detection system, or are they investing in the company? Well, they're investing in the company. Okay. So let me – Let's talk about whether or not this is materially misleading to someone who's thinking about investing in the company. Okay. I think, again, you will find that this allegation is not false. We're going back to Silicon Valley, and they're – It's not false? No, no. So you're saying that, in fact, it was requested by the two coaches? It's not false. And I'll tell you why, Your Honor. And we're going to remember now that we need to look at the specificity of their allegations in this case, and they have to be extremely specific. Now, you will find here, if you look at this, that there's a statement that the head coaches have invited CTI to provide thermal imaging. There's no statement that – Okay, so then the plaintiff comes back, and here's what the plaintiff alleges. This is false and misleading because the general counsel of the USATF says it did not authorize the press release, number one. Now, there's nothing in the press release that says it was authorized by the USATF. I'm having trouble with the next sentence. Okay, step number two. They say that it did not – and the general counsel said that USATF does not endorse CTI equipment. There's nothing in the press release – They said the second sentence, not the second clause. They say, in fact, a volunteer chiropractor requested the equipment. Well, remember the pleading requirements. It's completely consistent with this pleading that a volunteer chiropractor went to the coaches and said, I want to get this equipment. And the coaches or the USATF invited CTI to provide the equipment. There's nothing in here that says that – there's nothing in here in this press release that says that the chiropractor placed the order. It says the chiropractor requested it, and then it says the coaches invited. So it's not even a false statement, Your Honor. I mean, if you look at it, they're not even alleging any false statement. Well, I'm sorry. I'm a little slow. I got you. So you're saying that, in fact, the coaches did request this equipment. They have the pleading burden, Your Honor, and I'm saying this completely consistent with what they pled that the coaches could have requested this equipment. I mean, the chiropractor asks for the equipment. The coaches then invite CTI to provide it. You know, this is so vague and so inadequate compared to that pleading standard when you have the coaches – I mean, when you have them saying that the chiropractor requested it. Well, so what? If I were a chiropractor and I wanted that equipment, I'd go to the organization and I'd say I want the equipment. They don't have the adequate – moreover, I wanted to say one more thing about materiality, Your Honor, and that is that there's also no allegation that they didn't, in fact, use the equipment. I mean, it seems to me that what's material about this is that, hey, we've got this equipment being used by the USATF, and there's no allegation that the USATF didn't use the equipment. No, I got it. Okay. Okay. So actually, I'm using up – my gosh, I'm using up a lot of our time. I'm going to turn this over to Mr. Markler. Thank you. I know you are, but that was a useful exchange. Thank you, Your Honor. May it please the Court, Counsel, I'm Charles Markley. I represent only John Brenna in this case. Mr. Brenna is a latecomer to this transaction. He was only involved, as far as we can tell from the pleadings, for the last nine months of the 26-month class period. It's my understanding that the falsity that is complained of is summarized in paragraph 66 of the complaint, which says, All representations concerning the timing and progress of the submission of Module 5 were false when made. The plaintiffs used a shotgun approach to determining the allegations against Mr. Brenna. The complaint says, All defendants, which would include Brenna, knew of all of the misrepresentations. That's at paragraphs 26 and 78. There's no specifics, however, and this is of great concern to Mr. Brenna, and I think it points up the inadequacies in the complaint as a whole. There's only two allegations of any misstatements that occurred during Mr. Brenna's watch. He apparently came on, as far as we can tell from the pleadings, as president after Mr. Packer left. We know Packer left on March 11th. Wasn't he vice president of sales before that, though? Pardon me? Wasn't he vice president of sales before that? There are statements in the briefs that's not in the record that he was a vice president of sales from October 2000 on, a few months earlier.  So no indication in the plaintiff's complaint that he had anything to do with the sale of the equipment to Mexico? That's correct. The first statement that's attributed to him is a Newswire report of April 6th, 2001. Mr. Brenna is quoted as saying, We are anxious to submit Module 5. We submit it on its face. That is not misleading, that Mr. Brenna was anxious to submit Module 5. I think everybody was anxious to submit that. It doesn't, on its face, say that it's misleading. Silicon Graphics would tell us that we need to submit some more information to show the court and the defendants why that statement was misleading. He also says, in that same release that's attributed to him, We are making every effort to have Module 5 prepared for submission prior to the end of the second calendar quarter. Prior to the end of June, the second calendar quarter. It wasn't false at all. In fact, they say in their very next paragraph, paragraph 63 of their complaint, they allege that indeed it was submitted in June of that year. So it wasn't false at all. There is no inaccuracy. We have generalized and conclusory statements. The next one that is attributed to Mr. Brenna says, June 15, 2001, I am quite pleased with the submission package. On its face, again, that's a fairly innocuous statement. It doesn't even seem to be material. Silicon Graphics would require us to have the plaintiffs tell us why is it when Mr. Brenna says he's pleased with the submission package that that is false and untrue. The last one that I want to attribute to him is after this. He says, last Friday, CTI reached a milestone with the submission of the fifth and final module. It just doesn't seem to be the kind of a statement that is the subject of a class action federal court complaint against someone. Thank you. Thank you. You've saved a little time. Your Honors, still the big issue before us is the one which Judge Tolman's last question most addressed, was the totality of the allegations. The totality of these allegations show that this company committed securities fraud. In February of 2003 and in August of 2003, the Ninth Circuit issued two separate opinions, one in No. 84 Employer Teamster Joint Council Pension Trust Fund and BRODO, which I mentioned earlier. In the first case, which is quoted in BRODO, the Ninth Circuit said, beyond each individual allegation, we also consider whether the total of plaintiff's allegations, even though individually lacking, are sufficient to create a strong inference that defendants acted with deliberate or conscious recklessness. In this case, the total of the allegations show this, demonstrate that during the class period, defendants violated 10B. Defense counsel has recently stated that the issue of the imaging system isn't BCDS, and therefore it just doesn't matter in this case. But when we look at the total of information, yes, this is a small company. BCDS was their largest product during this time. But their other products were relevant, too. And when we look at the total mix, they weren't just misleading shareholders about the BCDS system. They were also misleading shareholders about their other products, including this imaging system, which was not purchased by, not ordered by these, the coaches of the track and field. And the entire... Well, how do we know that? That's not what your complaint says. Your complaint says that the press release wasn't authorized. It doesn't say that the head coaches didn't ask for the delivery of the equipment. I believe a reasonable investor would believe, and this is, again, an issue of fact, for the trier of fact. A reasonable investor, when reading that press release, would believe the head coaches wanted these products. And I believe when we now have an allegation in there, by inference, we have to plead these items as... The only allegation that you have made is that the statement was false and misleading because the general counsel didn't authorize the press release, and that it was a volunteer chiropractor who had requested the equipment. But as counsel pointed out, that doesn't mean that the head coaches didn't say to the volunteer chiropractor, yeah, we'd like it if they're willing to donate it. That's what your complaint says. It says the general counsel told them not to, did not endorse it. And it's a question of fact. Well, endorsement is different from saying, sure, we'll take the equipment. That doesn't necessarily mean we think it's great equipment, but if you want to give it to us for free, we'll be happy to try it. This is an issue of fact, and a reasonable investor would be misled. An issue of fact, if you can get past the pleading requirement, I'm having problems with the way you've pled your false and misleading evidence here. If that is the case, Your Honors, while I believe that there is enough here on this complaint in addition to their admissions, leave would be appropriate because that's an issue that certainly could be applied, while I do believe it's adequate. Thank you, Your Honors. Thank you very much. The case of Croft v. Computerized Thermal Imaging is now submitted for decision. The next case on the argument calendar is Cox v. Viacom International. Thank you.
judges: Reavley , W. Fletcher, Tallman